J-S15001-23
J-S15002-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| TERMINATION OF PARENTAL RIGHTS TO: K.I.P., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.G.A. A/K/A L.G.G., MOTHER | : : : : : : : : | |
| | : | No. 1544 MDA 2022 |

Appeal from the Decree Entered October 18, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0120a

| | | |
|---|---|---|
| TERMINATION OF PARENTAL RIGHTS TO: R.P.P., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.G.A A/K/A L.G.G., MOTHER | : : : : : : : : | |
| | : | No. 1545 MDA 2022 |

Appeal from the Decree Entered October 18, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0121a

| | | |
|---|---|---|
| IN THE INTEREST OF: R.P.P., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.P., FATHER | : : : : : : : : | |
| | : | No. 1589 MDA 2022 |

Appeal from the Decree Entered October 18, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0121a

J-S15001-23
J-S15002-23

IN THE INTEREST OF: K.I.P., A        :    IN THE SUPERIOR COURT OF
MINOR                                :         PENNSYLVANIA
                                     :
                                     :
                                     :
APPEAL OF: C.P., FATHER              :
                                     :
                                     :
                                     :
                                     :
                                     :    No. 1590 MDA 2022

Appeal from the Decree Entered October 18, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0120a

BEFORE:  BOWES, J., STABILE, J., and SULLIVAN, J.

MEMORANDUM BY BOWES, J.:                        **FILED JUNE 28, 2023**

L.G.A. a/k/a L.G.G. ("Mother") and C.P. ("Father") (collectively, "Parents") appeal from the October 18, 2022 decrees involuntarily terminating their parental rights to K.I.P., born in January 2020, and R.P.P., born in March 2021.[1]  After careful review, we affirm.

We glean the factual and procedural history of this matter from the certified record.  The York County Office of Children, Youth & Families ("CYF" or "the agency") first became involved with this family in May 2021, after the agency received multiple reports of domestic disputes from both General Protective Services ("GPS") and Child Protective Services ("CPS") over several

_____

[1] Parents, who are not married, filed separate appeals in the above-captioned matters.  On November 23, 2022, this Court consolidated Mother's appeals at 1544 and 1545 MDA 2022.  On December 15, 2022, we similarly consolidated Father's appeals at 1589 and 1590 MDA 2022.  These consolidated appeals are inextricably interrelated in that they both implicate Parents' respective parental rights to K.I.P. and R.P.P.  Thus, we will address the issues raised by Parents collectively in this writing, where it is appropriate.

months. These concerns culminated in an incident on May 1, 2021, when officers of the York Area Regional Police responded to the family's residence and found Mother, Father, and K.I.P. suffering from injuries. Mother and K.I.P. suffered minor facial injuries and Father received serious cuts to his fingers after Mother attacked him with a knife. *See* Amended Status Review Recommendation, 1/21/22, at 2-3. The juvenile court awarded emergency custody of both children to CYF, and one week later, it determined that legal and physical custody should remain with CYF. On May 18, 2021, the juvenile court adjudicated K.I.P. and R.P.P. dependent, and eventually placed the children in their current foster home, which is a pre-adoptive resource. *See* N.T., 10/17/22, at 157.

The family's service plan ("FSP") issued the same month as the dependency adjudication established an initial permanency goal of reunification. Parents were permitted joint, supervised visitations with K.I.P. and R.P.P. twice every week. These joint visitations eventually became separate in March 2022 at the request of both parties. During the course of this case, neither Mother nor Father ever progressed to unsupervised visitations with K.I.P. or R.P.P. *Id*. at 22, 56. Furthermore, the frequency of visits progressively decreased for Parents between May 2021 and July 2022. By the time CYS filed the underlying termination petitions in this matter, Father's visits were occurring only once every two weeks due to substance abuse concerns. *Id*. at 82-83; *see also* Revised Permanency Plan, 7/8/22,

at 9. Similarly, Mother's visits had declined to just once every week. **See** Revised Permanency Plan, 7/8/22, at 9.

Parents were assigned several goals under the permanency plan, including, *inter alia*, addressing their domestic violence issues, completing mental health, parenting, drug and alcohol, and anger management assessments, and following through on the resulting recommendations. Following her disclosure that she was suffering from anxiety and postpartum depression, Mother was also individually directed to attend appropriate mental health therapy and participate in medication management.

Between June 2021 and July 2022, Parents were also enrolled in several support and educational programs, including PA Child Trauma Intensive Family Support Services ("TIFSS"), Pressley Ridge Intensive Family Services ("Pressley Ridge"), Catholic Charities Intensive Family Services ("Catholic Charities"), and the Commonwealth Clinical Group ("CCG"). Father also received services and counseling from TRIAD for Domestic Violence ("TRIAD"). In June 2021, Parents began TIFSS, which is an intensive program focused upon parental reunification and included therapy, parenting education, and supervised visitations. **See** N.T., 10/17/22, at 22-24. However, Parents were unsuccessfully discharged from this program in December 2021 due to their intractable conflicts with, and threats against, the staff. **See** Permanency Review Order, 1/19/22, at 2-3; N.T., 10/17/22, at 20-24.

Thereafter, Parents began parental education and supervised visitations through Pressley Ridge beginning in January 2022. *Id*. at 50-51. Ultimately, Mother was discharged unsuccessfully from this program in April 2022 due to her "hostile" behavior towards the staff. *Id*. at 52-56. Indeed, Mother's conduct became sufficiently problematic that Pressley Ridge issued a "no trespassing" letter to her. *Id*. at 53. Father also did not successfully complete the program before the filing of the termination petitions. *Id*. at 54. Mother then began receiving advocacy services from Catholic Charities in April 2022. However, she was ultimately also discharged unsuccessfully from that program in July 2022. *Id*. at 97-98. Parents were also enrolled in services provided by CCG beginning in March 2022, which were focused upon stabilizing Mother's emotions and addressing Father's domestic violence issues. *See* N.T., 10/17/22, at 130-31, 215-16. Mother was still in therapy and counseling through CCG as of October 2022. *Id*. at 130-31. By contrast, Father successfully completed domestic violence counseling with TRIAD in February 2022 and CCG in June 2022. *Id*. at 215-16.

Nonetheless, the physical conflicts between Mother and Father persisted throughout this period. On November 4, 2021, Father called and reported to the agency that Mother had attacked him with "two knives." Status Review Recommendation, 1/21/22, at 2. Similarly, in February 2022, CYF learned there was another physical altercation between Parents, wherein Father struck Mother following a verbal altercation initiated by Mother. *See* CYF

Permanency Report, 3/2/22, at 3; **see also** N.T., 10/17/22, at 54-55. Accordingly, both Mother and Father were perpetrators of violence within their relationship. Due to this ongoing turmoil, Parents were purported to have separated sometime in March 2022. **Id**. at 171, 193. In approximately August of 2022, Father relocated to live with family in New Jersey. **Id**. at 146.

On July 5, 2022, CYF filed separate petitions to involuntarily terminate Parents' rights to K.I.P. and R.P.P. pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[2] A joint termination hearing was held on October 17, 2022, at which CYF presented testimony from its caseworker Elyse Nangle and TIFSS therapist Mariela Acre. There was extensive testimony from Pressley Ridge personnel, including family therapist Susan Brodbeck and family advocate Julia Harrison. Representatives from Catholic Charities also appeared, including family advocate Brittany Sunday. Mother testified and adduced testimony from, *inter alia*, CCG outpatient therapist Clarissa Richardson. Father testified on his own behalf and presented no additional evidence. Finally, we note that the records and orders from the underlying dependency proceedings were admitted into the record without objection. **See** N.T., 10/17/22, at 5-6.

_____

[2] On July 12, 2022, the orphans' court filed orders pursuant to 23 Pa.C.S. § 2313(a) that appointed Douglas J. Kozak, Esquire, to serve as legal counsel for then-two-and-one-half-year-old K.I.P. and appointed Christopher Moore, Esquire, as legal counsel for sixteen-month-old R.P.P.

On October 18, 2022, the orphans' court granted the petitions and involuntarily terminated the parental rights of Mother and Father as to K.I.P. and R.P.P. pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). On November 8, 2022, Mother filed timely notices of appeal at both above-captioned cases and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(i) and (b). On November 16, 2022, Father also filed timely notices of appeal at both cases along with concise statements of errors. Thereafter, the orphans' court issued responsive opinions pursuant to Rule 1925(a) addressing the claims of Mother and Father separately.

In her brief to this Court, Mother broadly asserts that there were insufficient grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). *See* Mother's brief at 6-7. The claims enumerated in Father's appellate brief mirror these arguments. *See* Father's brief at 5-6. As discussed further *infra*, our analysis will focus exclusively on § 2511(a)(8) and (b). In pertinent part, both Mother and Father assert that the orphans' court erred as a matter of law and/or abused its discretion by: (1) holding that the conditions which led to the removal of K.I.P. and R.P.P. continued to exist and that termination will best serve their needs and welfare pursuant to 23 Pa.C.S. § 2511(a)(8); and (2) finding that termination was appropriate with respect to the developmental, physical, and emotional needs and welfare of K.I.P. and R.P.P. pursuant to 23 Pa.C.S. § 2511(b). *See* Mother's brief at 6-7; Father's brief at 6. We will address Mother's and Father's respective claims in turn.

The following basic legal principles will guide our review:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa.Super. 2022) (internal citations and quotation marks omitted).

The involuntary termination of parental rights is governed at statute by 23 Pa.C.S. § 2511 of the Adoption Act, which necessitates a bifurcated analysis that focuses first upon the "eleven enumerated grounds" of parental conduct that may warrant termination pursuant to § 2511(a)(1)-(11). *M.E.*, *supra* at

- 8 -

830. If the orphans' court determines that a petitioner has established grounds for termination under at least one of these subsections by "clear and convincing evidence," the court then assesses the petition under § 2511(b), which focuses primarily upon the child's developmental, physical and emotional needs and welfare. *Id.* at 830 (citing *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)); *see also* 23 Pa.C.S. § 2511(b). This Court "need only agree with any one subsection of § 2511(a), in addition to § 2511(b), in order to affirm the termination of parental rights." *T.S.M.*, *supra* at 267 (citing *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*)).

In the instant case, the orphans' court found that termination was appropriate pursuant to § 2511(a)(1), (2), (5), and (8). However, we need only agree with one such subsection, in addition to § 2511(b), in order to affirm involuntary termination. Thus, our analysis in this proceeding implicates § 2511(a)(8) and (b), which provide as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . . .

- 9 -

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

In order to satisfy § 2511(a)(8), the petitioner must prove that: (1) the child has been removed from the parent's care for at least 12 months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa.Super. 2018). Furthermore, termination pursuant to § 2511(a)(8) does not require an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal or placement of the child. *See In re M.A.B.*, 166 A.3d 434, 446 (Pa.Super. 2017). Rather, our inquiry is focused upon whether the at-issue conditions have been remedied such that "reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa.Super. 2009). This Court has acknowledged:

> [T]he application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting

responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen months, in which to **complete** the process of either reunification or adoption for a child who has been placed in foster care.

*Id*. at 11-12 (emphasis in original; internal citations omitted).

Finally, this Court has explained that,

while both [§] 2511(a)(8) and [§] 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to [§] 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by [§] 2511(b); as such, they are distinct in that we must address [§] 2511(a) before reaching [§] 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa.Super. 2008) (*en banc*).

With respect to § 2511(b), we are required to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). It is well-established that this query "requires the trial court to consider the nature and status of bond between a parent and child." *M.E.*, *supra* at 837 (citing *In re E.M.*, 620 A.2d 481, 484-85 (Pa. 1993). Furthermore, "[w]hen examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a 'necessary and beneficial relationship,' thereby causing a child to suffer 'extreme emotional consequences.'" *In re Adoption of J.N.M.*, 177 A.3d 937, 944 (Pa.Super. 2017) (quoting *E.M.*, *supra*, at 484-485). However, the "bond examination" is only one amongst many factors to be considered in assessing the soundness of termination:

- 11 -

In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. In determining needs and welfare, the court may properly consider the effect of the parent's conduct upon the child and consider whether a parent is capable of providing for a child's safety and security or whether such needs can be better met by terminating a parent's parental rights.

*M.E.*, *supra* at 837 (internal citations omitted). Finally, "common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, *supra* at 268. Accordingly, we emphasize that "the strength of emotional bond between a child and a potential adoptive parent is [also] an important consideration" in a "best interests" assessment pursuant to § 2511(b). *I.J.*, *supra* at 13.

We will begin by addressing the orphans' court's findings as to Mother pursuant to § 2511(a). With respect to § 2511(a)(8), she asserts that the orphans' court findings were not supported by competent evidence: "Since the basis for the removal of the children was domestic violence issues, and there was no evidence established at the hearing that there had been any domestic violence issues for over six months before the hearing, the [a]gency failed to meet its burden under . . . [§ 2511](a)(8)." Mother's brief at 30-31.

As a threshold matter, we note that Mother is mistaken to the extent that she suggests that domestic violence was the only issue that precipitated the removal of K.I.P. and R.P.P. from her care. Rather, the agency also

- 12 -

became concerned regarding Mother's mental health. Indeed, the stipulation of facts signed by Mother's counsel indicates that, upon first making contact with CYF in May 2021, Mother averred that she needed help with, *inter alia*, her "mental health." Stipulation of Facts, 9/26/22, at ¶ 6. The record indicates Mother suffers from anxiety, post-traumatic stress disorder, and postpartum depression. **See** N.T., 10/17/22, at 112, 168.

Thus, rather than a narrow conclusion predicated solely upon the mere frequency of confirmed domestic violence between Parents, the orphans' court framed its findings under § 2511(a)(8) as a broad conclusion that Mother's "self-regulation issues" had not improved by the time of the termination hearing. **See** Trial Court Opinion, 12/5/22, at 20. Specifically, the orphans' court found that, "though Mother engaged in therapy to treat her various issues throughout the tenure of these cases, the **multiple** teams of service providers never saw enough improvement to increase the frequency of Mother's visitation or downgrade the levels of supervision necessary for those visitations." Trial Court Opinion, 12/5/22, at 21. As expounded upon *infra*, with respect to the needs and welfare of K.I.P. and R.P.P. under § 2511(a)(8), the orphans' court noted that "termination best serves the needs and welfare of the children in that all service providers queried on the topic, **as well as Father**, found that the foster situation was good for the children." **Id**. (emphasis in original).

Preliminarily, with respect to the first prong of § 2511(a)(8), there is no dispute that both K.I.P. and R.P.P. have been removed from Mother's care for the requisite twelve months. Turning to the second prong, we note that there is also ample evidence demonstrating that Mother's mental health and domestic violence issues continue unabated. On two separate occasions during the course of this case, Mother assaulted Father with a knife. *See* Amended Status Review Recommendation, 1/21/22, at 2-3. Mother's argument that there have been no subsequent incidents fails to acknowledge the seriousness of these events. TIFSS therapist Mariela Arce also reported that Mother was "hearing voices from a ghost" during a hospital visit in November 2021. Permanency Review Order, 1/19/22, at 3.

Concomitantly, the record also reflects that Mother has been largely unsuccessful in addressing these issues. She has been involuntarily discharged from three different service providers during the lifetime of this case: (1) TIFSS in December 2021 for behavioral issues and threats made against the staff; (2) Pressley Ridge in April 2022 due to "hostile" behavior; and (3) Catholic Charities in July 2022 due to the court's entry of the goal change order precluding reunification. *See* N.T., 10/17/22, at 20-24, 52-56, 97-98. The respective testimonies of Ms. Acre, Ms. Brodbeck, and Ms. Sunday confirm these discharges were unsuccessful, *i.e.*, services concluded before Mother addressed her underlying issues. *Id*.

Moreover, while Mother has been successfully participating in therapeutic services provided by CCG since March 2022, these efforts have not yielded any salient improvement in her condition. Ms. Richardson testified that Mother still suffered from significant, unresolved emotional turmoil and that she had not yet begun to process her domestic violence issues:

> Q. All right. So you're saying that the eight sessions that you've had with [M]other have focused on entirely the emotional distress or whatever is bothering her in that moment when she comes in.
>
> A. Correct.
>
> Q. So you haven't had a chance to address domestic violence and anger management with [M]other because of that. Is that right?
>
> A. Anger management and domestic violence was [sic] brought up because it was part of her distress, but the main focus was on stabilizing her motions as opposed to processing the domestic violence.
>
> Q. Okay. So would you say that you have a lot more work to accomplish with [M]other yet?
>
> A. Yes, we have work that needs to be done.
>
> Q. All right. And there is no estimated discharge or time frame for discharge. Is that right?
>
> A. Not at this time, no.

N.T., 10/17/22, at 130-31. Ms. Nangle testified similarly that Mother had not yet achieved resolution of either her mental health or her domestic violence issues. *Id*. at 176-77. Based upon the foregoing, we find ample evidence

supporting the orphans' court's finding that the conditions that led to the removal of K.I.P. and R.P.P. continue to exist as to Mother.

Turning to the third and final prong of § 2511(a)(8), the orphans' court concluded that termination would best serve the needs and welfare of K.I.P. and R.P.P., who were approximately two and one-half and one and one-half years old, respectively, at the time of termination. Specifically, the court based this determination largely upon the unanimous opinions of the service providers who had the opportunity to observe K.I.P. and R.P.P. in foster care and testified at the termination hearing. *See* Trial Court Opinion, 12/5/22, at 21 ("[T]he termination best serves the needs and welfare of the children in that all service providers queried on the topic . . . found that the foster situation was good for the children."). There is more-than-adequate support in the certified record for the orphans' court's findings.

From the outset, we note that Mother and Father's fraught relationship led to a suspected physical injury to K.I.P. at the onset of CYF's involvement with this family. *See* Amended Status Review Recommendation, 1/21/22, at 2-3. By contrast, after observing both K.I.P. and R.P.P. in the pre-adoptive foster home, Ms. Brodbeck reported that "there was definitely a positive relationship between foster parents and the children. [The children] definitely felt comfortable and safe with them as well." N.T., 10/17/22, at 62. She described both K.I.P. and R.P.P. receiving appropriate direction, discipline, and freedom to play in their foster home. *Id*. Ms. Nangle relayed the same

- 16 -

observations in her testimony, wherein she averred that "these boys are very well taken care of" in their foster home. *Id*. at 151. Ms. Harrison also reported that the children were happy and comfortable. Indeed, as previously indicated, even Father was supportive of the children's foster placement. *Id*. at 218 ("I am happy. I love [foster parents]. They are good people. They are good parents."). In comparison to the uncertainty and risk of physical harm that existed in the children's familial home, there seems to be little dispute in the record that termination of parental rights in anticipation of adoption will serve the needs and welfare of both K.I.P. and R.P.P.

Based upon the foregoing analysis, we find that the orphans' court properly found sufficient evidence to terminate Mother's parental rights pursuant to § 2511(a)(8), in that: (1) more than twelve months had elapsed from the time of removal when the agency sought termination; (2) the conditions that precipitated removal continue to persist, *i.e.*, Mother's mental health and domestic violence issues are unresolved; and (3) termination in favor of adoption by foster parents will serve the needs and welfare of K.I.P. and R.P.P.

Having found sufficient grounds for termination pursuant to at least one subsection of § 2511(a), we now turn to consider the propriety of terminating Mother's parental rights in light of the provisions of § 2511(b), which, as we previously highlighted, afford primary consideration to "the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b).

Mother asserts the orphans' court failed to "give significant weight to the bond between [M]other and the children" or to "consider whether termination would destroy the existing beneficial relationship between [M]other and the children." Mother's brief at 34. For its part, the orphans' court's rationale did "not deny that there are bonds of sorts between Mother and the children," but concluded any bond with Mother was unhealthy and that the children "were primarily bonded, **and healthily so,**" with foster parents. Trial Court Opinion, 12/5/22, at 22-23 (emphasis in original). Thus, it found termination to be the "demanded" course of action to serve K.I.P.'s and R.P.P.'s "best interests." *Id*. at 23.

Instantly, Mother's arguments are focused upon the bond examination mandated by Pennsylvania law. *See E.M.*, *supra*, at 484-485. In addition to the forgoing discussion addressing the children's needs and welfare pursuant to § 2511(a)(8), we observe that the certified record belies Mother's contention that she has a well-established bond with R.P.P. To the contrary, Ms. Brodbeck described multiple occasions during which Mother asserted that she was unable to feel a bond with R.P.P. *See* N.T., 10/17/22, at 57. Furthermore, Ms. Brodbeck also reported that Mother used domestic chores to essentially avoid interacting with both children during supervised visitations. *Id*. at 59. While Ms. Sunday testified that she believed that there was a bond between the children and Mother, assuming, *arguendo*, that some manner of bond exists between Mother and the children, the evidence of

- 18 -

record establishes that the stronger, healthier bond in this matter exists amongst K.I.P., R.P.P., and foster parents.

For this point, the orphans' court largely relied upon the testimony of Ms. Nangle, who averred as follows with respect to the bond analysis:

> Q.     Now both of the children were fairly young when they came into care into their current home.  Correct?
>
> A.     Yes.
>
> Q.     So in the last year and a half or so the day-to-day needs have been met by the resource family?
>
> A.     Yes.
>
> Q.     When we weigh the bond that the children have with the resource family versus [M]other, where does the stronger parental bond lie?
>
> A.     The foster [parents].
>
> Q.     And when we weigh the bond that the children have with the resource family versus [F]ather, where does the stronger bond lie?
>
> A.     Foster [parents].
>
> Q.     And why do you believe that the stronger bond lies with the resource parents rather than [M]other and [F]ather?
>
> A.     The day-to-day care.  The children are always with foster parents, and [Mother and Father] only see the children once a week or once every other week.

*Id*. at 153-54.

This testimony underscores the undisputed fact that Mother never progressed to unsupervised visitations with either K.I.P. or R.P.P. Furthermore, as detailed above, her efforts to ameliorate the issues that

caused the children's removal have been unsuccessful. Ms. Richardson confirmed that there is no knowable time frame for Mother to achieve her emotional and mental self-regulation goals. In this particular legal context, the permanency needs of the children must receive greater and more immediate consideration than the aspirations of even well-meaning parents. *See I.J.*, *supra* at 11-12 (emphasizing that this Court "cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future").

Based on the foregoing, we discern no abuse of discretion in the orphans' court finding that termination of Mother's parental rights will best serve the developmental, physical, and emotional needs and welfare of K.I.P. and R.P.P. pursuant to § 2511(b). Thus, we will affirm the decrees entered by the orphans' court terminating Mother's parental rights.

We now turn to Father's appellate issues. With respect to § 2511(a)(8), Father asserts that the domestic violence issues that caused the removal of the children no longer exist.[3] *See* Father's brief at 17-18. However, Father's arguments also concede that "[t]he domestic violence in this family was clearly exacerbated by the toxic relationship between Mother and Father." *Id.* at 18. Father alleges that his relationship with Mother has since ended, asserting, like Mother, that there have been no incidents of domestic violence

---

[3] During the lifetime of this case, Father has presented with a number of substance abuse issues.

since the couple allegedly separated in March 2022. *Id*. The orphans' court found sufficient grounds for termination pursuant to § 2511(a)(8), based on its conclusion that Father's domestic violence issues remained unresolved. *See* Trial Court Opinion, 12/5/22, at 18-20. We agree.

Initially, there is no dispute that CYF has fulfilled the first prong of § 2511(a)(8) in that the children have been removed from Father's care for the requisite twelve months. As above, we find that Father's arguments concerning the second prong gravely minimize the cascading incidents of violence committed by the parties in this case. For his part, Father admitted to beating Mother and having an ongoing problem with anger management. *See* N.T., 10/17/22, at 217 ("You know, I caused a lot of the issues or anger issues are because of me. . . . I have a problem with my hands. I used to beat her[.]"). Father likewise presented with a spotty record of service compliance. *See* N.T., 10/17/22, at 20-24, 154. Although Father completed some of the educational programs, the orphans' court noted that such completion is not an automatic indicator of beneficial progress. Specifically, the incident in February 2022 wherein Father struck Mother took place mere days after he "successfully" graduated from TRIAD's domestic violence diversion program. *See* Trial Court Opinion, 12/5/22, at 18-19 ("Father was successfully discharged from programming for domestic violence within days of his assaulting Mother, which militates against a finding that Father has truly addressed this concern[.]"); *see also* N.T., 10/17/22, at 55, 61, 65. Like the

orphans' court, we find this juxtaposition clearly bespeaks unresolved domestic violence issues for Father. Mere completion of mandated programming means little if it does not result in behavioral correction.

Moreover, although Father claims that the end of the parties' relationship has ended all domestic violence concerns, there is conflicting evidence in the record indicating that Mother and Father continued their relationship and mischaracterized the nature of their alleged separation to the court as reported by Ms. Brodbeck and Ms. Nangle. *Id*. at 62-63, 156. Overall, the record supports the orphans' court finding that Parents' continued relationship remained a cause of concern at the time of termination. *Id*. at 123. Based on the foregoing, we find the second prong of § 2511(a)(8) is also satisfied with respect to Father, in that his domestic violence issues continued to exist at the time CYF petitioned for termination.

As Father has confined his discussion of § 2511(a)(8) to the first and second prong of this statute, we address the third prong of section (a)(8) in disposing of Father's overlapping challenge to the orphans' courts needs and welfare analysis pursuant to § 2511(b). Instantly, Father asserts that he has a "healthy parental bond" with the children, which will result in negative "emotional consequences" if severed. Father's brief at 22. While acknowledging that Father has an undeniable bond with both K.I.P. and R.P.P., the orphans' court found that the children's exposure to the negative aspects of Parents' relationship coupled with the strength of the children's bond with

foster parents augured in favor of termination. ***See*** Trial Court Opinion, 12/5/22, at 20-21. For the reasons discussed above, we find no fault in the orphans' court's finding.

Like the orphans' court, we credit the existence of the bond that exists amongst Father, K.I.P., and R.P.P., which is undisputed in the record. However, contrary to Father's averments, that bond is not entirely positive. As noted by the orphans' court, Father's involvement in the children's lives has exposed K.I.P. to physical harm and both minors to emotional chaos in the form of Parents' fraught and violent relationship. ***See id***. at 21 ("[C]onsidering the children were exposed to at least some of Father's faults, *in toto*, the [c]ourt found that Father's relationship with the children was a toxic soup."). We also emphasize that Father's still-supervised visits with the children have decreased to just one visit every two weeks. Contrary to the averments in his brief, Father testified that he was pleased with the children's foster placement. ***See*** N.T., 10/17/22, at 218. As with Mother, the stronger, healthier bond in the lives of both K.I.P. and R.P.P. clearly resides with foster parents. ***Id***. at 153-54.

Based on the above analysis, we find that termination of Father's parental rights will best serve the developmental, physical, and emotional needs and welfare of K.I.P. and R.P.P. pursuant to § 2511(b). Accordingly, we affirm the decrees terminating Parents' respective parental rights.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 06/28/2023